Yes, Your Honor. May it please the court. My name is James Linger. I am counsel for the Montana Green Party and various individual Montana voters, some of whom have been Green Party candidates in the past or are at present Green Party candidates. As a housekeeping matter, I would point out as to the defendant, Apolli, that back in February, we filed a motion to Corey Stapleton has been succeeded by the new Secretary of State, who is Christy Jacobson. And I understand the panel must address that motion to substitute for the Apolli. Yeah, that'll happen. As a matter of course. Yeah, thank you. And I would like to reserve about three minutes of my time for rebuttal. Okay, you look at the clock and we'll try to help. All right. Thank you, Your Honor. What is unique and unusual about the ballot access tape for new political party formation in Montana is the fact that the district requirement for 34 of the 100 state house districts does not take a percentage of the total number of people in the district or the number of registered voters in the district, or even the total number of people who voted in that district for governor. But they use a 5% of the number of people in that district who voted for the statewide candidate for governor who won. And the result of that is a widely different requirement. Because the statewide candidate who won in Montana for governor may have won an individual house district by a landslide, he may have lost it by a landslide, or he or she may have won it in a close election, or lost it in close election even have an in between sort of 53, 47% victory or loss. So on this claim for the equal protection challenge to this approach of the percentage of votes for the winning governor, it would only be the individuals who would have that equal protection claim, right? Not the Green Party itself? Well, I think the Green Party has associational rights through its members. So that might be a First Amendment claim. But I'm asking about the equal protection claim. Or are you saying the Green Party has an equal protection claim? I think both the Green Party, since it's composed of individual voters of Montana, it and the individual voters who are plaintiffs, in this case, had an equal protection claim. Yes. So who as the Green Party, who is treated better? I mean, an equal protection claim is usually I'm discriminated against, as compared to someone else. What is the Green Party's equal protection claim? Well, the party and the individual people who signed the petition is against those people who signed the petition signature in house districts, where that district, the winning candidate for governor did much better in that district, say one in a landslide. Like really the individuals, the individuals who some of them say we are in a district where the threshold is too high, and we're treated unfairly because it's higher, it's harder to get someone on the ballot from our district signatures than some other district. That's the claim, right? That is correct. But it impacts the party also, as well as the individuals who signed the petition. But the party is also in the districts that are lower thresholds. So I have trouble seeing how the party itself, I mean, really, the claim comes from the individuals in the districts where it's harder, right? That is correct. However, because those individuals who signed the petitions wanted the party to be on the ballot, it affected the Green Party too. It's hard to separate the two. I them have a claim, but it is most important. The impact is not so much on the candidates or the party. The most important thing is the individual voters who have a right to equal protection and to cast their votes effectively and have a discussion on it. Do we have declarations from any individuals that explains where they live and who voted for governor in that district so that we can tell whether they're in a district that had a higher threshold for the ballot requirement? In the complaint, an amended complaint in this case, we had quite a few individuals here and they gave the locations of where they voted, yes. And so how do we know that those people have this injury? Do we have to take judicial notice of the election results? Because I don't think you provided us with an explanation of how it played out in each of the individual districts. Well, what we had was in stipulations, we had what districts, what the requirement is from district to district. But even if you're not in one of those districts, the fact that it impacts you wishing this party to get on the ballot, that has an effect because it keeps the party off the ballot because of just the invalidating a few petition signatures. Even if I'm in a district, so let me ask you, Mr. Liggett, your position is that for standing purposes, you do not need individuals from the particular affected districts or you do need them? I don't think we have to because wherever you are, the overall effect of the law affects you, even if you're in one of the better districts. But I mean, let me follow up on what Judge Friedland said. Do we have any evidence that any of these individuals do come from any of these affected districts? Well, we have the, well, I'm just saying the affected districts basically are every district I would say in which the candidate who won in 2016 or in the next election won by a big portion. And some of the individuals here, I mean, we can look at the districts there, but we don't have something where we said this was in one of the districts and they got this amount of signatures. What we do is each of the districts, we say how many votes or how many petition signatures were required and they were as low as 55 in the little ones. But the ones that were worse were the districts where it was 150 signatures or over 100 signatures, because even 100 signatures in a district, if you multiply by 100, that's 10,000 signatures statewide. Every one of the districts exceeds what's required statewide. Yes, I think I understand. Let me move on to something else. What exactly do you seek to accomplish here? Are you looking to invalidate as unconstitutional as 5% rule, which has created this type of disparity? I'm just trying to get my hands around what you want to accomplish here. The law should be declared unconstitutional as violation of Mooraby-Oglebay, which requires basically an equal number. You can't discriminate. In Mooraby-Oglebay, you had the same number of signatures required from counties of different populations. Here, we have legislated districts of the same population, but with maybe three times as many signatures required. Therefore, that should be held unconstitutional and enjoined from future enforcement. If we were to break down the 5%, though, you'd be left with 150 signature requirement in each district? No, I think the court can defer once this is stricken down to the Montana legislature correcting this. It could have been corrected easily if they have the same requirement in each house district, which would be equivalent to 1% would be 50 signatures. The 150 alternative number is the same in every district. So why would we strike that down? Well, no, it isn't. The 150 is the max it can be. Just as you might need 12,000 or 13,000 signatures, you have the 5% statewide, but they put a limit of 5,000. Here, they put a limit of 150, which would be 15,000 if you multiplied by 100. Let me interrupt for just a minute. This is basically a severability argument. If we were to strike down the percentage requirement as a violation of equal protection, there's the alternative basis, and that's 150. Now, as far as I can tell, valid equal protection argument against that, but are you telling us that, well, this is an integrated provision, and if we strike down one, we can't be confident that the other would have been enacted? I mean, I view this as a severability argument. How do you respond? I say this because it's not, we're not asking, it's not the problem of 5%. That seems like it's the same, but it's 5% of the winning candidate for governor. No, I understand. No, that's not. If they had a percentage. That's not my question. Assume that I agree with you that the 5% is a violation of equal protection. There's the alternative signature requirement, which is 150. There's no constitutional deficiency with 150. And the question is, well, do we just strike down the percentage requirement and leave intact the 150, or do we strike that and hold provision with respect to the 34 counties, because the 150 votes and the 5% requirement are so linked that they can't be properly severed. Here's the difference. The 150 is the maximum required. The 5,000 statewide is the most that can be required there, but it's not, it's below the 5%. The 150 in most instances is above 5% in most of the districts. Why does that mean we need to strike it down? Why does that mean it's invalid? It's invalid because it requires a different number of signatures in districts of the same population. No, the 150 doesn't. If the law only had the 150, what would the problem be? Well, there would not be a problem in that every district would have 150 signatures. It would be the same there. Yeah, that's my question. So why don't we just strike down the 5% to which you object and leave intact the 150? And that's Judge Friedland's question. You mean knock down the 5%? I like to call it the 5% of the winning candidate for governor, whatever you want to call it. Yes. Why would we strike down the 150? Well, I don't think you have to touch that simply to say, because of the 5% of the winning candidate for governor in each district, we have an unequal, and that's what we strike down. Now, if they want to put something there, I mean, like if they want to make it 50 or 200, where it's the same in each one, then you only have the problem that they're having a higher percentage in every one of these districts, whether it's 55 signatures up to 150, that's higher than the percentage of what, in effect, is required statewide. Let me ask you this. What are you asking for? Are you asking that we only strike down the percentage requirement or are you asking that we strike down the whole 150 signature alternative? Yes. Let me say this. Asking that you strike down the 5% requirement of the winning candidate for governor's vote statewide in each district. That's what I think can be done simply there. Okay. Are you saying that if we do that, we should leave intact the 150 signature requirement? I don't think you need to actually address that, and because if you strike that down and they don't have that, then there won't be an individual requirement there because that simply said they couldn't require more than 150 signatures in any state house district. But if they do the 5%, they may decide to make it 5% of the registered voters or 2%, or they may decide, the legislature may decide to make it of the total vote cast for governor. If they had done the total vote, as in like Libertarian V. Bond in Missouri, you would have something related to the number of people who are available to sign the petition, or if it had been based on the number of registered voters, that would relate to the number of people available to sign the petition, but not when you do it as to the winning candidate for governor, because there's such a wide variance from districts of the same. So say we agree with you. Say we agree with you. This 5% has to be gone. We put a line through it. It's gone. The law still has the 150. Isn't the party worse off at that point? The party might. Well, let me just say this. If you interpret it that way, it would be because you'd have to have more than you'd have to have 150. But then you would have the equal protection problem that you would have a requirement in effect, 100 times 150 is 15,000, which would be three times higher in an individual district than it would be for the state. And if it's if 5,000 signatures for the state as a whole, why couldn't it be 50 signatures? So that's why I think I would probably, if you're concerned about that, I'd strike down the 150 because the law, as it is applied, is unconstitutional. Mr. Langer, you have a minute and 45 seconds. I want to go into a different subject, different time. We're assuming for this last several minutes that the 5% thing should be or could be struck down. But I am reading the 8th Circuit decision in Bond and I'm reading the 10th Circuit decision in Semple and in particular in Bond, it seems to me that, you know, that's conceptually inconsistent with what you're urging. And I just wonder how you separate the 8th Circuit from what you think the 9th Circuit should do. And I think Semple also is another problematic case that comes from the 10th Circuit. Are we really running the risk of having a circus split here? No, Your Honor, I disagree with you, Judge Block, because in Bond in Missouri, it was based on the total number of people in that congressional district that had voted for a governor. And so that's the number that are available, not something that goes back and forth because in different districts, it could be a huge difference depending what type of district it was. In Semple, in the 10th Circuit, it was the number of registered voters. Once again, that's a representation of the number of people that are available, but that's not a representation when you just take the candidate at one. Yeah, I can see a distinction in Semple because it's based upon registrations and equal population districts. That seems to me that Bond conceptually is right on the money here. The only difference between the two is the percentage of the variations. I respectfully disagree, Judge Block, because in that it was the total number of people voted. You know, in some districts, congressional districts, particularly, which are much bigger, you know, three quarters of a million people compared to a 10,000 people in a state House district in Montana, the total number of people that voted in each district shows you a percentage of that, how many people are available to sign the petition, not the percentage of the candidates. Think of your own state of New York where you have to have half the congressional districts, 100 signatures, and you have like three quarters of a million people in each congressional district in New York and 100 signatures, the exact same number in each district. That's not an issue. But there's no one person, one vote problem with that type of thing. That could be. You have the same number. Yes. Yeah. We're talking about really the application of what used to be called the one man vote case. You know, that was politically incorrect. It's the one person, one voted. It's an equal protection argument. We're talking about that, I think. Yeah. Anyway, I want your thoughts on that. That is correct. It's equal protection violation for one person, one vote. And that's an application of the Morabi-Oglebay case, which does not, as you can see in Montana, the districts in some districts, you get a lot more than you do in others. And that affects every person who signed that petition. It affects everyone as how it's treated, because the different petition signers are treated differently in the effectiveness of their petition signature. Yes. I'm sorry. Realistically speaking, I mean, what's really kind of curious here is that if we agree with you, it's not going to make it easier for your Green Party to get on the ballot. I mean, it just seems to be so counterintuitive. What the legal aspects of that are a different question, but the practical aspects seem to be counterintuitive, in terms of what you would like to accomplish. Well, I think we have to, whatever the effect, I think we have to apply the law equally. The law is unconstitutional. But where I disagree is I don't think we have to keep 150 signatures because that was the maximum they required. And that percentage is three times what's required in the state at 5,000 signatures. Okay. So I'm just saying that creates another equal protection problem. I believe I should reserve the rest of my time at this point. Well, yes, we've taken you over time, but we will give you a chance to respond. Thank you, Your Honor. Let's hear from the other side. I'm not sure I'm pronouncing your name. Ms. Tokarud, is that how you pronounce it? Close, Tokarud, Your Honor. May it please the court, I'm Hannah Tokarud, an assistant attorney general with the state of Montana. And I'm here this morning on behalf of the Secretary of State. This case should be affirmed for three reasons. First, the challenge laws do not impose a severe burden. Second, the challenge laws serve the state's regulatory interests. And third, there's no equal protection violation. So I'll dive right into that third issue since that's where counsel spent his time. Good. Yeah. As an initial matter, we believe this argument, to the extent that it has morphed on appeal, was waived. The argument now seems to be that there is an equal protection violation because the percentage is different in individual districts versus statewide. And that argument was not raised below. So we think it's waived. Second, as alluded to earlier in the questioning, there is no standing. There's been no injury suffered by the Green Party or the individual plaintiffs. Plaintiffs have to show discrimination and they haven't done so here. The Green Party is- Could we just, for that, could I just ask about that? So it does seem that the complaint does not really explain where these people voted, what the percentages were in those districts, or anything like what they're sort of assuming in order to make this equal protection claim for the individuals. But could we take judicial notice of the voting in those districts and figure out whether, given where the individual plaintiffs were, subject to a higher signature burden than in other districts? I still think there's a missing link. We don't, as you said, there's no declaration saying, I'm a voter in this district and this is how I was affected by the law. This is how I was discriminated against. Even if you went to look at the voter rolls, I think that there'd still be a missing link. The Moore case that plaintiffs mentioned really deals with claims of the individual and of the voters. And we just don't have that here. But we do have some of the cities they live in, right? So could we look up, okay, what district is that city in? Was there a lot of votes, you know, a high percentage of votes for the winning governor in that district and figure out whether that plaintiff had a higher burden? Can we do that? I mean, I think that the plaintiffs have failed to meet their burden to the extent that the court, you know, wants to weigh in and do that. I think they've failed to show the discrimination that's required. The severe burden analysis also applies to equal protection claims and that's missing here. There's been no- So why do we care or why is it essential that we look at what did happen? We're after prospective relief. So the question really should be what can happen or what is likely to happen in the future. And it seems to me this, one of the arguments against the current system is that the percentage goes all over the place depending on what happens in the future election. So I'm not sure that is all that relevant what happened in the past. What's relevant is what will happen in the future. I agree, Your Honor, that they're seeking prospective relief to the extent that the formula is based on the percentage of votes cast in the previous election. You know, we look to the past for that, but- As to any individual voter, am I likely to be subjected to discrimination or unequal treatment? Well, yes, that it might have happened last year and last year's election doesn't necessarily tell me that it will happen next year. Or the fact that it didn't happen to me last year doesn't tell me that it won't happen next year. I think that's a fair assessment, Your Honor. And- So if we have a realistic possibility that any voter in any one of these districts will be subjected to the unequal requirement and be on the short end of it, why isn't that enough? Your Honor, the equal protection claim deals of- and the issue of one person, one vote deals with population where state requirements come into trouble with equal protection is when they're allocating equal political power to geographic units of unequal population. Now, you're not talking about the merits. I'm still talking about standing. Oh, OK. Now, so why isn't it enough that there's a realistic possibility that the voters that we have here might in some future election be on the short end of this equal protection argument? Your Honor, I still don't think we have any declaration, any statement saying I intend to vote in this district going forward. We just don't know, as you said, how the plaintiffs could be affected in future cases. But it's a system that we know operates unevenly as we go forward, correct? Now, you don't have to concede that it's a violation, but we know it's a system that operates unevenly depending on who the governor is, who's got the winning vote, what the percentage of the winning vote is. And so we end up getting fluctuating percentage requirements for individual districts. And they change from year to year, from district to district. That's right. The requirement number changes, and the Green Party and other minor parties can target the districts that have the lowest requirement. But the individuals can't move, presumably, very easily anyway. So the individuals, if they are in a district that ends up higher, they're stuck. I think that's fair. OK. What is the state's reason for this 5% of winning governor concept? Well, the state has the right and the responsibility to regulate its election. And here, the Montana State policymakers have picked a formula that is, as you know, based on the successful candidate for governor. I think it doesn't make sense, for example, to base that formula off of the losing candidate. Because if they got zero votes, then zero signatures would be required. If, as the plaintiff suggests, we use all the candidates for governor, that's a higher burden. That's a higher number of signatures. Well, only if you stick with 5%. Why not say 2% of the total votes for governor? I mean, I don't understand why whatever percentage is chosen is pegged to the winning candidate. I think it's a way to balance the state interest in showing some modicum of support with having an accessible system where the requirement is not too onerous. And the numerical cap was added in 1999 because after the 1996 election, one of the gubernatorial candidates died. And the winning candidate thus got a very high number of votes, and that 5% would have been really high. So Montana added- You end up, because it's based on this winning candidate notion, you end up with some districts that need many fewer signatures than other districts. Is there some explanation for why that's a good idea in terms of how likely it is that you need a third party? I mean, is there any connection between why you have a signature requirement for third parties and why you have this different number in different districts? I really struggle to understand what the policy reason is behind this approach. Your Honor, I think, as I said, it's trying to balance these competing interests and to make sure that there's a statewide showing of support. And we can't use counties because they're unequal. Montana only has one congressional district. So using the legislative districts makes sense. And then the 5% of the successful candidate is just a number that's meant to provide some showing of support, but not an unreasonable amount. And using the successful candidate gives us a clear winner. It gives us a clear basis for our number. And then it is also going to be a lesser number than total number of registered voters, total number of votes tasked. But that doesn't tell us why you would tie it to the successful governor when that number varies and then the percentage outcome will vary from county to county instead of just saying, you know, let's have a percentage that operates equally from one district to the next. I mean, I understand everything you've said. It all makes perfect sense until you get to the point where you say, well, we're going to key it off of the number of votes for the successful candidate for governor when that produces different numbers of signatures that are required from one district to the other. That's that last little piece that causes the trouble. I think it causes me trouble also, but, you know, I'm so curious because you have the history of Montana and in Brooklyn, I don't know about it, but it was nice to hear you tell me that in 1999 is when you added the 150 vote provision. And I think you explained the politics at that time and why that was done. But I did a little research and the 5 percent distribution requirement was established in 1981. And that was well after, you know, more of the Ogilvy and the reapportionment cases that came out in the late 60s. I'm just curious what was going on in 1981. Not that it makes any difference in terms of the application of law, but I just assume that there was a reason back in 1981 to put in place this distribution requirement, which is puzzling us and causing us problems today. Your Honor, so the access laws in Montana have changed a lot since statehood. And so the 5 percent of successful votes for the gubernatorial candidate, that dates back to 1971 or excuse me, 79. And then, as you said, the per district signature requirement dates back to 1981. And then the numerical caps are from the 1999 legislature. And I think this all goes to this changing balance over the years, making sure that things are working, that minor parties are getting on the ballot and also serving that state interest. Montana has a long history of minor party and independent candidates since this legislative scheme starting in 1982. We've had hundreds of candidates get on the ballot. The petition process has been successfully used eight times by minor parties. And Montana law has other mechanisms for ballot access as well, not simply this petition process. And the Green Party itself has used that twice since 2000. So I'm not specifically familiar with the legislative history as it was in 1981. But I think the course of the history shows the state trying to require some showing of support while providing that meaningful access. It took 30 years for somebody to step up to the plate and challenge the constitutionality of the 1981 law, I guess. There's no other challenges, I assume, to that law. Not that I'm aware of, Your Honor. Here's a question. I'm trying to figure this out. We have, for purposes of this one person, one vote, and then the signature requirements, we've treated as equivalent a vote and a signature. So in Judge Reinhart's opinion in the Idaho case, he calls it a vote, although he puts it in quotation marks. But of course, it's not a vote. It's a signature. Am I forbidden, actually, to talk about what really goes on? Which is to say, the real question is, how much money do we have to spend to get the signatures? How much money do we have to pay the person to stand outside the Safeway? These aren't votes. This is money expended to have somebody stand outside the store with the signature forms. Do I have to treat these as if they were votes? I don't think so, Your Honor. And I do think it goes to the associational right that you've just mentioned and to these other factors that a court looks at when assessing ballot access cases. Like, what does it actually look like? What's the pool of signers? What does it actually look like to do the process? And what's the burden of the law? The record's pretty thin here in terms of some of the points you just mentioned, like what's the cost of this? Does the case law allow me to say, well, you know, we don't treat this as if they were votes? Because the case law seems to treat these as if they were votes in terms of equal protection. I think that's fair, Your Honor. I don't think that's an escape hatch that will help you. I rather wish it were, because there's such a difference between an actual vote and standing outside the Safeway and getting a signature. Well, and diving into the merits a bit, I do agree with Judge Block's previous comment that the court decision of Libertarian Party versus Bond seems to be on point. And the appellants have failed to bring up a constitutional distinction between the formula. And I think it's similar here, where because we're dealing with geographic units that are of equal population, the fact that we're talking about a subset based on a formula within that group, there is no equal protection problem, because the geographic unit's the same. And that's what the burden is not the same. I mean, someone in a district that voted overwhelmingly for the winning governor has to get way more signatures than someone in a district who was against the winning governor. So it's not the same threshold or burden. Yeah, it is capped at the 150. But yes, the number. And Bond didn't have that kind of distinction, right? There's no discussion of people having different burdens to meet the requirement. I think the disparity in Bond was much smaller than the disparity here. And I wonder whether that makes a conceptual difference in terms of analyzing the constitutional issue. I think the argument and the basis of the equal protection claim is very similar to the one here, and that the reasons that the court rejected it apply here as well. I see I'm out of time. You are. Well, thank you for your argument. Mr. Linger, you sought to reserve some time. Let's put two minutes on the clock for you. Please, the court. Getting back to Bond, at least in Bond, it was the number of people who voted for governor, a percentage of that. And in Simple, it was the registered voters. Both of them have a relationship to who's available to sign the petition. The percentage of the vote for the winning candidate for governor doesn't. And in fact, even the 150 signatures may not be good because in each district, we may have a greater number of registered people voted, even though we have an equal population, or we may have more interest in total number of people voting for governor. So can I just ask you, in Bond, you might end up actually having more people vote in one place than another. So there might have been a different burden. But did the court talk about that? Well, what it talked about, not in our case, not at all. But in Bond, of course, they talked about the people that were available. And we also were talking about congressional districts, only like half the districts in Missouri, or Judge Blocks, New York, where they take half the congressional districts. We have here these little 10,000 people state house districts. I mean, that makes a big difference there. That has, that accentuates the effect. And then I do want to address this. I think it's really important where we talk about where we have to worry about standing or something, because even though we have where all these individual plaintiffs here, where they voted at, and which cities or counties they were in, what we do have to remember is it doesn't do me any good if I'm signing a petition just worrying about me. It's a group effort. If somebody else who's also supporting the petition is discriminated against, it affects me. Because the people in the district where they have to have 55 signatures, that is affected in the districts where they have to have 100 or 150 signatures, because that affects my petition signature being affected. So I'm just saying, you have to look at it altogether. The fact that if we have any group in this country where you say part of you are going to be discriminated against and part of you aren't, it's going to affect my rights. Because anything that diminishes other people's rights diminishes mine, particularly if we have a common cause that we are pursuing. So I want the court to consider that. I think that's what's important here. The law is clearly unconstitutional under Moore. And I think Judge Fletcher brought it up. I think he was referring to the Ninth Circuit decision in Idaho Coalition United for Bears, which he was on the panel. And that was an initiative. It wasn't about a party. But of course, there was unequal treatment, and that law was struck down. And I think it's the same thing here. It's a similar principle. And whatever the legislature decides to do, I think this court can make comments about that. But I think the whole thing has to go out on this. And this had a very severe effect, not just in the 2018 election, in the recent election. Both times, the Green Party is removed because of just a few signatures being knocked out. They had almost 50% more signatures than were needed statewide. And yet, as I showed in my briefs, only 13 signatures being removed from four or five districts put them below the level. And just that little bit of nitpicking. We've got that argument firmly in hand. Now, thank both sides for their interesting arguments and a very interesting case. So submitted, Montana Green Party versus Stapleton, and we'll replace the Stapleton. Submitted. Thank you very much. Next case, Oregon Advocacy Center and Metropolitan Public Defender Services versus Allen and Mattucci, if I'm pronouncing that correctly.
judges: W. Fletcher, Friedland, Block